**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| ROGER TROMBLEY, derivatively on behalf of COMMUNITY HEALTH SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> WAYNE T. SMITH, LARRY CASH, THOMAS J. AARON, KEVIN J. HAMMONS, JOHN A. CLERICO, MICHAEL DINKINS, JAMES S. ELY III, JOHN A. FRY, TIM L. HINGTGEN, WILLIAM NORRIS JENNINGS, K. RANGA KRISHNAN, JULIA B. NORTH, and H. JAMES WILLIAMS, <br><br> Defendants, <br><br> -and- <br><br> COMMUNITY HEALTH SYSTEMS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE ACTION:** <br><br> **JURY TRIAL DEMANDED** |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Roger Trombley ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Community Health Systems, Inc. ("CYH", "Community Health", or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Wayne T. Smith, Larry Cash, Thomas J. Aaron, Kevin Hammons, John A. Clerico, Michael Dinkins, James S. Ely III, John A. Fry, Tim L. Hingtgen, William Norris Jennings, K. Ranga Krishnan, Julia B. North, and H. James Williams (collectively, the "Individual Defendants" and together with Company, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of CYH, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of

1

the Exchange Act.

As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CYH, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Company's directors and officers from February 20, 2017 through to present (the "Relevant Period").

2.      CYH is an operator of general acute care hospitals. The organization's affiliates own, operate or lease 105 hospitals in 18 states with approximately 17,000 licensed beds. Affiliated hospitals provide healthcare for residents.  The Company's hospitals offer a wide range of diagnostic, medical and surgical services in inpatient and outpatient settings.

3.      During the Relevant Period, the Individual Defendants breached myriad fiduciary duties by causing and or allowing the Company to issue materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company not to disclose to investors: (1) that the Company had understated its contractual allowances; (2) that the Company had understated its provision for bad debts; (3) that, as a result, the Company had overstated its net operating revenue; (4) that, as a result, the Company had understated its net loss;

2

and (5) that, as a result of the foregoing, the positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4. On February 27, 2018, the Individual Defendants were no longer able to prevent the Company from disclosing the reality of situation. On that day, the Company announced its full year 2017 financial results and reported a $591 million increase to contractual allowances and bad debt provision. On this news, the Company's share price fell $1.06 per share, more than 17%, to close at $5.12 per share on February 28, 2018, on unusually heavy trading volume.

5. The Individual Defendants' breaches of fiduciary duty and other misconduct exposed the Company, the Company's Chief Executive Officer ("CEO"), and both its former and present Chief Financial Officers ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

6. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

7. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

3

78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have jurisdiction.

11.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

12.     Plaintiff has continuously held CYH common stock during the Relevant Period.

### Nominal Defendant CYH

13.     Defendant Community Health Systems, Inc. is incorporated under the laws of Delaware with its principal executive offices located in Franklin, Tennessee. Community Health's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CYH."

### Defendant Smith

14.     Defendant Wayne T. Smith ("Smith") has served as the Company's CEO and as a Company director since 1997, and as its Chairman since 2001. He previously served as the President of the Company from 1997 to 2014. According to the Company's Schedule 14A filed with the SEC on April 4, 2019 (the "2019 Proxy Statement"), as of March 18, 2019, Defendant Smith beneficially owned 2,802,545 shares of the Company's common stock, which represented 2.4% of the Company's outstanding shares of common stock on that date. Given that the price per

4

share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Smith owned over $12.1 million worth of Community Health stock. For the fiscal year ended December 31, 2017, Defendant Smith received $4,945,992 in compensation from the Company. This included $1,600,000 in salary, $1,378,500 in restricted stock awards, $812,000 in non-equity incentive plan compensation, a change in pension value and deferred compensation of $1,055,772, and $99,720 in all other compensation.

**Defendant Cash**

15. Defendant W. Larry Cash ("Cash") served as Community Health's CFO and Executive Vice President from 1997 to 2017, and as a Company director from 2001 to May 2017. According to the 2019 Proxy Statement, as of March 19, 2019, Defendant Cash beneficially owned 661,152 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2018 was $4.33, Cash owned approximately $2.86 million worth of Community Health stock. For the fiscal year ended December 31, 2017, Defendant Cash received $1,125,761 in compensation from the Company, despite retiring in May of that year. This included $332,019 in salary, $294,080 in restricted stock awards, $412,866 in pension value and deferred compensation, and $96,796 in other compensation.

**Defendant Aaron**

16. Defendant Thomas J. Aaron ("Aaron") has served as the Company's CFO and Executive Vice President since May 2017. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Aaron beneficially owned 408,011 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Aaron owned approximately $1.76 million worth of Community Health stock. For the fiscal year ended December 31, 2017, Defendant Aaron received $1,749,244 in compensation from the Company. This included $646,875 in salary, a bonus of $25,000, $413,150 in restricted stock awards, $646,875 in non-equity incentive plan compensation, and $17,344 in other compensation.

**Defendant Hammons**

17.     Defendant Kevin J. Hammons ("Hammons") has served as the Company's Chief Accounting Officer and Senior Vice President since 2012.

**Defendant Clerico**

18.     Defendant John A. Clerico ("Clerico") has served as a Company director since 2003. He also serves as Chairman of the Compensation Committee and as a member of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Clerico beneficially owned 141,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Clerico owned approximately $610,459 worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Clerico received $307,497 in compensation from the Company. This included $137,500 in fees earned or cash paid and $169,997 in restricted stock awards

**Defendant Dinkins**

19.     Defendant Michael Dinkins ("Dinkins") has served as a Company director since December 2017. He also serves as a member of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019 Defendant Dinkins beneficially owned 18,028 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Dinkins owned approximately $77,880 worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Dinkins received a prorated amount of $6,522 in compensation, all in cash fees, from the Company. For the fiscal year ended December 31, 2018, Defendant Dinkins received $290,000 in compensation, including $120,000 in cash fees and $170,000 in restricted stock awards.

6

**Defendant Ely**

20.     Defendant James S. Ely III ("Ely") has served as a Company director since 2009. He also serves as Chairman of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Ely beneficially owned 91,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Ely owned approximately $394,459 worth of Community Health stock.

**Defendant Fry**

21.     Defendant John A. Fry has served as a Company director since 2004. He also serves as a member of the Compensation Committee and the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Fry beneficially owned 73,013 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Fry owned approximately $315,416 worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Fry received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

**Defendant Hingtgen**

22.     Defendant Tim L. Hingtgen ("Hingtgen") has served as the Company's President and Chief Operating Officer ("COO") since September 1, 2016, and he has served as a Company director since 2017. According to the 2019 Proxy Statement, as of March 18, 2018, Defendant Hingtgen beneficially owned 525,024 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Hingtgen owned approximately $2.27 million worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Hingtgen received $2,209,826 in compensation from the Company. This included $800,000 in salary, $689,250 in restricted stock awards,

7

$312,000 in non-equity incentive plan compensation, a change in pension value and deferred compensation of $393,318, and $15,258 in all other compensation.

**Defendant Jennings**

23.     Defendant William Norris Jennings ("Jennings") has served as a Company director since 2008. He also serves as a member of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Jennings beneficially owned 73,489 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Jennings owned approximately $317,472 worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Jennings received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

**Defendant Krishnan**

24.     Defendant K. Ranga Krishnan ("Krishnan") has served as a Company director since 2017. He also serves as a member of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Krishnan beneficially owned 12,373 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Krishnan owned approximately $53,451 worth of Community Health stock.  For the fiscal year ended December 31, 2017, Defendant Krishnan received a prorated amount of $6,522 in compensation, all in cash fees, from the Company. For the fiscal year ended December 31, 2018, Defendant Krishnan received $290,000 in compensation from the Company. This included $120,000 in fees earned or cash paid and $170,000 in restricted stock awards.

**Defendant North**

25.     Defendant Julia B. North ("North") has served as a Company director since 2004, and she is currently the Lead Director. She also serves as a member of the Compensation

8

Committee and as the Chairman of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant North beneficially owned 96,939 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, North owned approximately $418,776 worth of Community Health stock. For the fiscal year ended December 31, 2017, Defendant North received $302,247 in compensation from the Company. This included $132,250 in fees earned or cash paid, and $169,997 in restricted stock awards

**Defendant Williams**

26.    Defendant H. James Williams ("Williams") has served as a Company director since 2015. He also serves as a member of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Williams beneficially owned 38,189 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Williams owned approximately $164,976 worth of Community Health stock. For the fiscal year ended December 31, 2017, Defendant Williams received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.    By reason of their positions as officers and/or directors of CYH and because of their ability to control the business and corporate affairs of CYH, the Individual Defendants owed CYH and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CYH in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CYH and its shareholders so as to benefit all shareholders equally.

28.    Each director and officer of the Company owes to CYH and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

9

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CYH, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers, directors, and controllers of CYH were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CYH, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised CYH's Board at all relevant times.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

33.     To discharge their duties, the officers and directors of CYH were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CYH were required to, among other things:

a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States, and pursuant to CYH's own Code of Ethics and Conduct;

b)      remain informed as to how CYH conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

c)      establish and maintain systematic and accurate records and reports of the business and internal affairs of CYH and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CYH's operations would comply with all applicable laws and CYH's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

e)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

f)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

g)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

11

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

34.     Each of the Individual Defendants further owed to CYH and its shareholders the duty of loyalty requiring that each favor CYH's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

35.     At all times relevant hereto, the Individual Defendants were the agents of each other and of CYH and were always acting within the course and scope of such agency.

36.     Because of their advisory, executive, managerial, directorial, and controlling positions with CYH, each of the Individual Defendants had access to adverse, non- public information about the Company.

37.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CYH.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

39.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

12

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CYH was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CYH and was at all times acting within the course and scope of such agency.

## CYH'S CODE OF CONDUCT

43.     The Company's Code of Conduct was adopted by the Board of Directors and states, in part, as follows:

> The Code of Conduct (the "Code") is designed to provide all persons and businesses associated with Community Health Systems, Inc. and its subsidiaries (collectively "CYH" or the "organization") including directors, officers, colleagues, physicians, contractors, and agents with guidance to perform their daily activities in accordance with the organization's ethical standards and all federal, state, and local laws, rules, and regulations. The Code is an integral component of the organization's Compliance Program and reflects our commitment to achieve our goals within the framework of the law through a high standard of business ethics and compliance. This Code of Conduct has been adopted by the Board of Directors of Community Health Systems, Inc. and by each subsidiary.

13

44.    It further states it is an initial "Statement of Beliefs," that the Company is "dedicated to compliance with all federal, state, and local laws, rules." With respect to policies concerning compliance and regulations, the Code states as follows:

> Facilities and colleagues must comply with all applicable federal, state, and local laws, rules, and regulations. Any colleague who witnesses or suspects any violations of any law or regulation must immediately report said violation or suspected violation to a supervisor, the Facility Compliance officer, the Corporate Compliance and Privacy Officer, or the Confidential Disclosure Program.

45.    It further states the Company is "committed to full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, as well as in other public communications or in material that we develop for internal use." Further, it states the following:

> As a public organization, our integrity and reputation depend upon the accuracy and completeness of our financial statements. All accounts and financial records must be maintained strictly in accordance with the CYHPSC Financial Policies and Procedures, as amended from time to time. Colleagues must always keep in mind that each bookkeeping and financial entry will ultimately be incorporated into our consolidated financial statements. Our consolidated financial statements are certified by our officers as being true and correct and not misleading and are presented to the public and the federal government in accordance with generally accepted accounting principles and all Securities and Exchange Commission rules and regulations. All personnel who make bookkeeping and financial entries, prepare financial reports and statements, and disperse assets (especially cash) have special ethical obligations as you perform your duties.

46.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a).

## COMMUNITY HEALTH'S AUDIT & COMPLIANCE COMMITTEE CHARTER

47.    The Company's Audit & Compliance Committee Charter provides that the Committee shall "assist the Board of Directors in its oversight of (1) the integrity of the Company's

financial statements, [and] (2) the Company's compliance with legal and regulatory requirements," including use of the proper accounting methods.

48.     The Audit & Compliance Committee Charter also provides that the members of the Committee must "[b]ecome familiar with the accounting and reporting principles and practices applied by the Company in preparing its financial statements."

49.     Specifically addressing accounting standards, the Charter provides that the Committee must examine all changes and potential changes in accounting practices and ensure that financial information is reported properly:

> Obtain and review a report from the Independent Accountant regarding (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management and the ramifications of the use of such alternative disclosures and treatments, (3) the treatment preferred by the Independent Accountant, and (4) other written communications such as any management letters or schedule of unadjusted differences.

50.     The Audit & Compliance Committee is also tasked with overseeing the Company's internal controls:

> Obtain and review reports from Management assessing the effectiveness of the Company's internal control structure and procedures for financial reporting, including (1) all significant deficiencies or material weaknesses in the design or operation of internal controls, (2) any fraud, whether or not material, that involves Management or other employees having a significant role in the internal controls, and (3) all significant changes to internal controls, including corrective actions, since the last report to the Committee.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

51.     On February 20, 2017, certain Individual Defendants caused the Company to announce its fourth quarter and full year 2016 financial results. For 2016, it reported $18.438 billion net operating revenue, $1.721 billion net loss, and $564 million adjusted EBITDA.

52.     On February 21, 2017, the Company filed its annual report on Form 10-K for the period ended December 31, 2016, which affirmed the previously reported financial results. Regarding third party reimbursements, the Company stated:

15

Net operating revenues include amounts estimated by management to be reimbursable by Medicare and Medicaid under prospective payment systems and provisions of cost-reimbursement and other payment methods. In addition, we are reimbursed by non-governmental payors using a variety of payment methodologies. Amounts we receive for treatment of patients covered by these programs are generally less than the standard billing rates. Contractual allowances are automatically calculated and recorded through our internally developed "automated contractual allowance system." Within the automated system, payors' historical paid claims data are utilized to calculate the contractual allowances. This data is automatically updated on a monthly basis. All hospital contractual allowance calculations are subjected to monthly review by management to ensure reasonableness and accuracy. We account for the differences between the estimated program reimbursement rates and the standard billing rates as contractual allowance adjustments, which we deduct from gross revenues to arrive at operating revenues (net of contractual allowances and discounts). The process of estimating contractual allowances requires us to estimate the amount expected to be received based on payor contract provisions. The key assumption in this process is the estimated contractual reimbursement percentage, which is based on payor classification and historical paid claim data. Our automated contractual allowance system does not maintain the contractual allowance at the patient account level as it estimates an average contractual allowance by payor classification. Due to the complexities involved in these estimates, actual payments we receive could be different from the amounts we estimate and record.

53. The 2016 10-K was signed by Defendants Smith, Cash, Hammons, Clerico, Ely, Fry, Jennings, North, Williams, and non-Defendant H. Mitchell Watson.

54. On April 6, 2017, the Company filed its 2017 Proxy Statement with the SEC. Defendants Smith, Aaron, Clerico, Dinkins, Ely, Fry, Hingtgen, Jennings, Krishnan, North, and non-defendant Williams solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

55. With respect to adherence to the Code of Conduct, the Proxy Statement stated the following:

The Company has a robust compliance program, the cornerstone of which is our Code of Conduct. Our Code of Conduct has been adopted and implemented throughout our organization and is applicable to all members of the Board of

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

16

Directors and our officers, as well as employees of our subsidiaries. A variation of this Code of Conduct has been in effect at our Company since 1997.

56. The 2017 Proxy Statement, however, was false and misleading and the Individual Defendants were responsible. For example, it was false and misleading regarding executive compensation in that the Individual Defendants purported to employ "pay-for performance" elements, including equity awards designed to "effectively align the interests of management with those of stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements. The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

57. On May 1, 2017, the Company announced its first quarter 2017 financial results and reported $4.486 billion net operating revenue, $199 million net loss, and $527 million adjusted EBITDA.

58. On May 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2017, which affirmed the previously reported financial results. Therein, the Company noted the adoption of a new accounting standard that would impact its provision for bad debts. The Company stated, in relevant part:

> In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, which outlines a single comprehensive model for recognizing revenue and supersedes most existing revenue recognition guidance, including guidance specific to the healthcare industry. . . . The Company expects to adopt this ASU on January 1, 2018 and is currently developing its plan for adoption and the impact on its revenue recognition policies, procedures and control framework and the resulting impact on its consolidated financial position, results of operations and cash flows. The Company has established an implementation group for this ASU with an implementation plan to transition to the new standard and determine its impact during 2017.

17

Additionally, the adoption of the new accounting standard will impact the presentation on the Company's statement of operations for a significant component of its provision for bad debts. After adoption of the new standard, the majority of what is currently classified as the provision for bad debts will be reflected as an implicit price concession as defined in the standard and therefore an adjustment to net patient revenue. The Company will continue to evaluate certain changes in collectability on its self-pay patient accounts receivable resulting from certain credit and collection issues not assessed at the date of service, including bankruptcy, and recognize such amounts in the provision for bad debts included in operating expenses on the statement of operations. The Company plans to elect to apply the full retrospective approach upon adoption. The Company cannot reasonably estimate at this time the quantitative impact that the adoption of this accounting standard will have on the financial statements of the Company.

59. The quarterly report was signed by Defendants Smith, Cash, and Hammons. The quarterly report further stated that the Company would be adopting Accounting Standards Update that would change its revenue recognition methods, altering its accounting for its provision for bad accounts,

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, which outlines a single comprehensive model for recognizing revenue and supersedes most existing revenue recognition guidance, including guidance specific to the healthcare industry. This ASU provides companies the option of applying a full or modified retrospective approach upon adoption. This ASU is effective for fiscal years beginning after December 15, 2017, with early adoption permitted for annual periods beginning after December 15, 2016. The Company expects to adopt this ASU on January 1, 2018 and is currently developing its plan for adoption and the impact on its revenue recognition policies, procedures and control framework and the resulting impact on its consolidated financial position, results of operations and cash flows. The Company has established an implementation group for this ASU with an implementation plan to transition to the new standard and determineits impact during 2017…

Additionally, the adoption of the new accounting standard will impact the presentation on the Company's statement of operations for a significant component of its provision for bad debts. After adoption of the new standard, the majority of what is currently classified as the provision for bad debts will be reflected as an implicit price concession as defined in the standard and therefore an adjustment to net patient revenue. The Company will continue to evaluate certain changes in collectability on its self-pay patient accounts receivable resulting from certain credit and collection issues not assessed at the date of service, including bankruptcy, and recognize such amounts in the provision for bad debts included in operating expenses on the statement of operations. The Company plans to elect to

18

apply the full retrospective approach upon adoption. The Company cannot reasonably estimate at this time the quantitative impact that the adoption of this accounting standard will have on the financial statements of the Company.

60.     Attached to the report were SOX certifications signed by Defendants Smith and Cash attesting to the accuracy of the 1Q17.

61.     On August 1, 2017, the Company announced second quarter 2017 financial results and reported $4.144 billion net operating revenue, $137 million net loss, and $435 million adjusted EBITDA.

62.     On August 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2017, which affirmed the previously reported financial results. Defendants Smith, Aaron and Hammons signed the report and Defendants Smith and Aaron signed SOX certifications attesting to its accuracy.

63.     On November 1, 2017, the Company announced third quarter 2017 financial results and reported $3.666 billion net operating revenue, $110 million net loss, and $331 million adjusted EBITDA. Also, on November 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2017, which affirmed the previously reported financial results. The report was signed by was signed by Defendants Smith, Aaron, and Hammons. Attached to the report were SOX certifications signed by Defendants Smith and Aaron, attesting to the accuracy of the report.

64.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company had understated its contractual allowances; (2) that the Company had understated its provision for bad debts; (3) that, as a result, the Company had overstated its net operating revenue; (4) that, as a result, the Company had understated its net loss; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

19

## THE TRUTH EMERGES

65.     On February 27, 2018, the Company announced its fourth quarter and full year 2017 financial results, which included a $591 million increase in contractual allowances and bad debt provision. Specifically, the Company stated:

> As required by generally accepted accounting principles, the Company adopted the new revenue recognition accounting standard on January 1, 2018. In connection with this adoption, during the fourth quarter of 2017, the Company completed an extensive analysis of its patient revenues and patient accounts receivable and developed new accounting processes and methodologies. This analysis also included an evaluation of patient accounts receivable retained after the 2017 divestitures of 30 hospitals, and certain other revenues. Based on the information obtained related to the aforementioned adoption, the financial results discussed below include a change in estimate recorded by the Company during the three months and year ended December 31, 2017 to increase contractual allowances and the provision for bad debts by approximately $591 million.

66.     On this news, the Company's share price fell $1.06 per share, more than 17%, to close at $5.12 per share on February 28, 2018, on unusually heavy trading volume.

## DAMAGES TO CYH

67.     As a direct and proximate result of the Individual Defendants' conduct, CYH has lost and will continue to lose and expend many millions of dollars. Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, and certain executives, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, including possible restatements.

68.     Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

20

## DERIVATIVE ALLEGATIONS

69.     Plaintiff brings this action derivatively and for the benefit of CYH to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of CYH, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof. CYH is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiff is, and has been at all relevant times, a shareholder of CYH. Plaintiff will adequately and fairly represent the interests of CYH in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

72.     A pre-suit demand on the Board of CYH is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven Individual Defendants, Wayne T. Smith, John A. Clerico, Michael Dinkins, James S. Ely III, John A. Fry, Tim L. Hingtgen, William Norris Jennings, K. Ranga Krishnan, Julia B. North, and H. James Williams, and non-defendant Elizabeth T. Hirsch (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was commenced.

73.     Demand is excused as to all of the Directors except Hirsch because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to

impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

74. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

75. There are additional reasons that demand is futile. With respect to Defendant Smith, he has served as the Company's CEO since 1997, and as its Chairman since 2001. He also served as the Company's President from 1997 to 2014. Thus, as the Company admits, he is a non-independent director. Also, he received nearly $5 million in compensation during fiscal year ended 12/31/17. Defendant Smith was ultimately responsible for all the false and misleading statements and omissions that were made, including those in the 2016 10-K, which he signed, together with a SOX certification. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Smith is a defendant in the Securities Class Action. For these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

76. Demand on Defendant Clerico is also futile for additional reasons. He has served as a Company director since 2003 and serves as a member of the Audit & Compliance Committee and as a member of the Compensation Committee. He also served as the Chairman of the Audit & Compliance Committee during the Relevant Period. Furthermore, Defendant Clerico signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons,

22

too, Defendant Clerico breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

77. Demand on Defendant Dinkins is futile. Defendant Dinkins has served as a Company director since 2017 and serves on the Audit & Compliance Committee. As a Company director and member of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Dinkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

78. Demand on Defendant Ely is futile. Defendant Ely has served as a Company director since 2009 and serves as the Chairman of the Audit & Compliance Committee. As a director and Chairman of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ely signed, and thus personally made the false and misleading statements, in the 2016 10-K. For these reasons, too, Defendant Ely breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

79. Demand on Defendant Fry is futile. Defendant Fry has served as a Company director since 2004 and serves as a member of the Compensation Committee and the Governance & Nominating Committee. He also served as a member of the Audit & Compliance Committee during the Relevant Period. As a director and member of the Audit & Compliance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Fry signed, and thus personally made the false and misleading statements, in the 2016

23

10-K. For these reasons, too, Defendant Fry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

80.     Demand on Defendant Hingtgen is futile.  Defendant Hingtgen has served as the Company's President and COO since September 2016, and as a Company director since 2017. Thus, as the Company admits, he is a non-independent director. Community Health provides Defendant Hingtgen with his principal occupation; he receives handsome compensation, including $2,209,826 during the fiscal year ended December 31, 2017. As an officer and a trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Hingtgen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

81.     Demand on Defendant Jennings is futile. Defendant Jennings has served as a Company director since 2008 and serves as a member of the Governance & Nominating Committee. Defendant Jennings signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Jennings breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

82.     Demand on Defendant Krishnan is futile.  Defendant Krishnan has served as a Company director since 2017 and serves as a member of the Governance & Nominating Committee. Defendant Krishnan receives substantial compensation, including $290,000 during the fiscal year ended December 31, 2018. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too,

24

Defendant Krishnan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

83.     Demand on Defendant North is futile. Defendant North has served as a Company director since 2004 and currently serves as Lead Director. She also serves as Chairman of the Governance & Nominating Committee and as a member of the Compensation committee. Defendant North signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant North breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

84.     Demand on Defendant Williams is futile.  He has served as a Company director since 2015. He also serves as a member of the Audit & Compliance Committee. Defendant Williams signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

85.     There are additional reasons why certain Directors would be unwilling to commence legal action against another Director given their longstanding personal and professional relationships.  Specifically, Directors Smith and Clerico previously served as members of the board of Praxair Inc., where Director Hirsch served as Vice President, Controller and Director of Investor Relations from 2010 to 2016.

86.     CYH has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CYH any part of the damages CYH suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

87.     The conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or

25

disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self- interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile. The acts complained of herein constitute violations of fiduciary duties owed by CYH's officers and directors, and these acts are incapable of ratification. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CYH. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of CYH, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused. If there is no directors' and officers' liability insurance, then the Directors will not cause CYH to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well. Thus, for all the reasons set forth above, all of the Directors, and, if not all of them, at least a majority of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

# FIRST CLAIM

## Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

88. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

89. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

90. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

91. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

92. Under the direction and watch of the Directors, the Proxy Statement failed to disclose material informational and omitted material information was there was a duty to do so. For example, it was false and misleading regarding executive compensation in that the Individual Defendants purported to employ "pay-for performance" elements, including equity awards designed to "effectively align the interests of management with those of stockholders," while

27

failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements. The Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

93.     The false and misleading elements of the 2017 Proxy Statement led to the re-election of the Directors, which allowed the Individual Defendants to continue breaching their fiduciary duties to CYH. Plaintiff, on behalf of CYH, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

94.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

95.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CYH's business and affairs.

96.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

97.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CYH.

98.     In breach of Delaware law and their fiduciary duties owed to CYH, the Individual Defendants have caused the Company to fail to hold an annual meeting of the stockholders for over 13 months.

99.     In breach of their fiduciary duties owed to CYH, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

100.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CYH's securities.

101.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CYH's securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

102. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

103. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CYH has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

104. Plaintiff on behalf of CYH has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

105. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

106. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CYH.

107. The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses, stock options, or similar compensation from CYH that was tied to the performance or artificially inflated valuation of CYH, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

108. Plaintiff, as a shareholder and a representative of CYH, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

109. Plaintiff on behalf of CYH has no adequate remedy at law.

30

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

110. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

111. The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

112. As a result of the failures of internal control and resulting financial misstatements, the Individual Defendants have caused the Company to incur costs associated with the investigation into such misstatements and the restatement of two quarterly reports and one annual report.

113. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused CYH to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its services.

114. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

115. Plaintiff on behalf of CYH has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of CYH, and that Plaintiff is an adequate representative of the Company;

31

B.    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to CYH;

C.    Determining and awarding to CYH the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Directing CYH and the Individual Defendants to hold an annual meeting of the stockholders;

E.    Directing CYH and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CYH and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

a) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board; and

b) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

c) Awarding CYH restitution from Individual Defendants, and each of them;

d) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

e) Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  August 20, 2019

Respectfully submitted,

*s/Jerry E. Martin*

**JERRY E. MARTIN (NO. 20193)**
**DAVID W. GARRISON (No. 24968)**
BARRETT JOHNSTON
MARTIN & GARRISON LLC
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com


**LEVI & KORSINSKY, LLP**
Gregory Mark Nespole (GN 6820)
Samir Shukurov (SS 9491)
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel:  (212) 363-7500
Fax:  (212) 363-7171
gnespole@zlk.com
shukurov@zlk.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Roger Trombley, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: ROGER C TROMBLEY          Date: 08/19/2019